William **BOLTON,** Commonwealth Holding Co., and Oliver R. Grace, Jr., suing individually and derivatively in the right and for the benefit of Terrydale Realty Trust, and BCG Associates, Plaintiffs,

v.

John J. **GRAMLICH,** J. Russell Gramlich, Michael J. Gramlich, James A. Kostoryz, Terrydale Management Corporation, John D. O'Flaherty, J. Harlan Stamper, Thomas J. Murphy, Morris, Larson, King, Stamper and Bold, P. C., San Francisco Real Estate Investors, Lincoln Tower Building Co., and Subdale Corp., Defendants,

and

Terrydale Realty Trust, Nominal Defendant.

William **BOLTON,** Commonwealth Holding Co., and Oliver R. Grace, Jr., suing individually and derivatively in the right and for the benefit of Terrydale Realty Trust, Plaintiffs,

v.

John J. **GRAMLICH,** Michael J. Gramlich, James A. Kostoryz, Terrydale Management Corporation, J. Russell Gramlich, Paul D. Ambrose, John D. O'Flaherty, J. Harlan Stamper, and Thomas J. Murphy, Defendants,

and

Terrydale Realty Trust, Defendant and Nominal Defendant.

Nos. 81 CIV 2806 (LBS), 80 CIV 7410 (LBS).

United States District Court, S. D. New York.

Jan. 28, 1982.

Leventritt, Lewittes & Bender, Sidney Bender, Aaron Lewittes, New York City, for plaintiffs in Bolton I and Bolton II.

Williams & Connolly, Steven M. Umin, Paul Martin Wolff, Donald E. Schwartz, F. Whitten Peters, Washington, D. C., and Windels, Marx, Davies & Ives, J. Daniel Mahoney, New York City, for defendant Trustees of Terrydale Realty Trust in Bolton I and Bolton II.

Turk, Marsh, Kelly & Hoare, John Anthony Smith, New York City; for nominal defendant Terrydale Realty Trust in Bolton I and Bolton II.

Polsinelli, White & Schulte, David A. Welte, Joseph R. Colantuono, Kansas City, Mo., and Hall, Dickler, Lawler, Kent & Howley, Norman L. Faber, New York City, for defendants Michael J. Gramlich, James A. Kostoryz and Terrydale Management Corp. in Bolton I and Bolton II.

Proskauer, Rose, Goetz & Mendelsohn, Marvin E. Frankel, Alexander Gigante, New York City, for defendants Lincoln Tower Bldg. Co. and Subdale Corp. in Bolton II.

D'Amato & Lynch, Robert E. Meshel, Andrew R. Simmonds, New York City, for defendant Morris, Larson, King, Stamper & Bold, P.C. in Bolton II.

Landels, Ripley & Diamond, Harvey L. Leiderman, San Francisco, Cal., and Rogers & Wells, Herbert C. Earnshaw, Rex W. Mixon, Jr., New York City, for defendant San Francisco Real Estate Investors in Bolton II.

## OPINION

SAND, District Judge.

In the two actions now before the Court on motions to dismiss, the plaintiffs are disappointed tender offerors who strain to find protection in federal law. The defendants, who perceive the plaintiffs' pleading as an invalid attempt to invoke a federal forum, allege that the plaintiffs have impermissibly grafted federal claims onto what are essentially state law claims for breach of fiduciary duty. The transactions giving rise to this litigation are complex but may be somewhat simplified for the purposes of this motion to dismiss in which the plaintiffs' allegations are taken as true. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972).

## I

## BACKGROUND

The events in question involve the control of Terrydale Realty Trust ("the Trust"), a Missouri real estate investment trust. The extensive cast of characters will unfold in the following chronological account.

On December 18, 1980, prior to the annual meeting of its shareholders, the trustees issued a proxy statement proposing amendments to the Declaration of Trust which would impose the requirement of a supermajority two-thirds vote on transactions such as merger, consolidation, reorganization, liquidation, termination and dissolution. The proxy statement disclosed that management's desire to ward off takeover attempts motivated the proposal. On December 30, 1980, the plaintiffs, William Bolton, Commonwealth Holding Co. (a partnership consisting of Robert A. and Rosalind Posner), and Oliver R. Grace, Jr., whose collective holdings at that time constituted approximately 11.7% of the outstanding securities of the Trust, sued to enjoin the annual meeting, alleging that inadequacies in the proxy statement undermined the validity of the proxies solicited. This Court denied the preliminary injunction on January 9, 1981 on the ground of failure to prove likelihood of success on the merits. This action, 80 Civ. 7410 (LBS) ("Bolton I"), comprises a federal cause of action under § 14 of the Securities Exchange Act of 1934 ("1934 Act") and two state law claims raised derivatively on behalf of the Trust. This action survives despite the fact that the proposal failed, which was the result urged by the plaintiffs in their proxy statement. The labyrinth of events producing this ironic effect and leading to a second litigation, 81 Civ. 2806 (LBS) ("Bolton II"), grew out of a tender offer by the plaintiffs.

Before dealing with the events surrounding the tender offer, however, in order to avoid confusion with the contentions in Bolton II, the plaintiffs' theories of recovery in Bolton I should be stated. First, the plaintiffs claim that various acts of the defendants violated state law fiduciary duties and misappropriated Trust opportunities. The defendants' motions do not contest the substance of these claims.[1] They seek dismissal of these claims now for lack of personal jurisdiction. Both plaintiffs and defend-

1. The basis of the state claims is not relevant to the instant motions. Briefly, plaintiffs claim: (1) that the Gramlich family (J. Russell Gramlich, John J. Gramlich, and James A. Kostoryz, both directly and through Terrydale Management Corp.), defendants in this action, has controlled the Trust in such a way as to extract excessive personal gain in the form of a management fee equivalent to 6% of the Trust's gross rentals; (2) the defendants John J. and Michael Gramlich, and James A. Kostoryz procured an appraisal of the Trust's real estate at the expense of the Trust for their personal investment purposes, and further, that they used this information for their own advantage before they disclosed it to the public; (3) the Gramlich family conspired with defendant J. Harlan Stamper to defeat plaintiffs' takeover attempt by either insuring their own domination with supermajority voting provisions, or, alternatively, by terminating the Trust, in violation of their fiduciary duties. Bolton I Complaint, ¶ 10–24.

ants agree that the state claims are not pendent on the federal claims because they do not share a common nucleus of operative fact. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The defendants argue that the existence of a basis for personal jurisdiction over the federal claims will not provide jurisdiction over the state law claims where there is no pendent jurisdiction.[2]

The plaintiffs' federal claim cites disclosure failures in the proxy statement that preceded the annual shareholders meeting. The plaintiffs argue that the defendants failed to disclose that if the shareholders rejected the amendments, the defendant trustees would vote to terminate the Trust. In other words, if their attempt to thwart the plaintiffs' plans with supermajority provisions failed, they would in turn accomplish the same end by exercising the very power that the defeat of the amendments left in them. The plaintiffs claim that this omission was "highly material" because they, the plaintiffs, would have acted differently had they known; that is, they would not have mounted the takeover attempt described *infra.* Citing § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), they seek reimbursement of the $225,000 they spent opposing the defendants' proxy solicitation. Bolton I Complaint at ¶ 27.

The defendants' motions contest this claim on the ground of lack of standing to sue under § 14(a). They argue that case law plainly establishes that there is no private right of action under § 14(a) for a disappointed tender offeror. The plaintiffs contend that they sue not as tender offerors, but as proxy contestants.

With respect to both the federal and state law claims in Bolton I, the defendants contest the plaintiffs' failure to demand that the board institute the action on the Trust's behalf, as required by Fed.R.Civ.P. 23.1, a

requirement the plaintiffs would excuse on the ground of futility.

The facts giving rise to Bolton II begin in the interim between the filing of the Bolton I complaint and the denial of the preliminary injunction. During this time, the plaintiffs took two actions. First, on January 3, 1981, they issued a proxy statement of their own, urging rejection of the amendments and disclosing their intention to make a tender offer for the Trust's stock conditioned on the rejection of the proposed amendments. And on January 8, 1981, through a limited partnership known as BCG Associates (consisting of William Bolton, Oliver R. Grace, Jr., and Robert A. Posner), the plaintiffs made their conditional tender offer. BCG offered to purchase at least 160,000 of the shares tendered before the February 10, 1981 deadline at $33.50 net per share.

The shareholders meeting took place on January 14, 1981 and, although affirmative votes (213,989) exceeded negative votes (204,989), the amendments failed to garner the needed votes of a majority of outstanding shares (or 230,533 votes).

On January 21, 1981, the trustees distributed a letter recommending rejection of the tender offer. This letter triggered the plaintiffs' second suit for a preliminary injunction, this time demanding corrections of alleged false or misleading statements or omissions in the recommendation letter. The defendants counterclaimed for a preliminary injunction of the tender offer. In *BCG Associates v. Terrydale Realty Trust*, 81 Civ. 0582 (RJW) (Feb. 9, 1981), Judge Ward refused to enjoin the tender offer, after he had supervised the process of correcting the inadequacies of both parties' letters to the shareholders.

Before the deadline for tender of shares and withdrawal of tendered shares, how-

---

**2.** There is complete diversity between the plaintiffs and defendants, and therefore subject matter jurisdiction. The plaintiffs (William Bolton, Oliver Grace, and Commonwealth Holding Co.) are all New York residents. Bolton I Complaint at ¶ 2. The defendants John J. Gramlich, Michael J. Gramlich, J. Russell

Gramlich, Paul Ambrose, John D. O'Flaherty, James A. Kostoryz, and J. Harlan Stamper are all Missouri residents, and the other defendant, Terrydale Management Corporation, is a real estate investment trust created under the laws of Missouri with its principal place of business in Missouri.

ever, the trustees launched a drastic divestment program. On February 6, four days before the expiration date of the offer, the trustees disclosed that they had voted unanimously to terminate the Trust, contracted for and closed the sale of four of its Denver office buildings,[3] and voted to declare the first liquidating distribution of $24.00 per share, using the proceeds of the sale. The distribution, payable on February 23, 1981, would go to the shareholders of record on February 19, 1981, a date subsequent to the expiration of the tender offer.

After this disclosure, the plaintiffs extended the tender offer nine days, to February 19, 1981. 65,000 of the shares that had been deposited pursuant to the offer were withdrawn. Ultimately, the plaintiffs acquired 80,884 shares through the tender offer, leaving them with the collective total of 208,629 shares and 37.98% of the outstanding securities of the Trust.

The terms of the Declaration of Trust restricted the trustees to cash transactions if they were to avoid the need for a shareholder vote. The trustees' vote to sell the buildings required a majority vote, and the vote to terminate the Trust required a unanimous vote. Although all five trustees voted in favor of the sale and termination, the plaintiffs argue that the actions were not valid because three of the trustees had a personal interest in defeating the tender offer.[4]

The plaintiffs theorize that the desire to avoid personal loss led the defendants to take actions that would influence shareholders not to tender or to withdraw tendered shares. The plaintiffs argue that in serving their own interests rather than those of the shareholders, the defendants violated their state law fiduciary duty. Because of the restriction to a cash only sale and because of the time pressure imposed by the February 10 deadline on the tender offer, the plaintiffs contend, the Trust realized only $17,098,000 in the sale of the buildings, whereas otherwise the Trust could have realized "at least $38,000,000." Bolton II Complaint at ¶ 17.[5]

---

3. These four buildings represented approximately 80% of the Trust's assets.

4. The plaintiffs marshal the following facts in support of their claim that three of the trustees were not qualified to vote:

(i) The Management Corporation would have lost its management contract under which it received $322,000 in fees from the Trust for the 1980 fiscal year;

(ii) J. Russell Gramlich's two sons and son-in-law and Terrydale Management Corporation would have been required to hold 37,737 shares of the Trust for at least three months, could only sell approximately 5,493 shares every three months thereafter, and would be obligated to pay interest of about $200,000 per year without any likely source of income to pay the same as a result of their having borrowed 100% of the purchase price of said shares;

(iii) J. Russell Gramlich with 90,000 unregistered shares of the Trust would have been unable to dispose of his shares except under the limitations of Rule 144 and other SEC rules;

(iv) the Gramlich defendants would have lost control of Terrydale;

(v) the Management Corporation which was controlled by the Gramlich defendants would have lost its opportunity to obtain fees on the liquidation of the Trust which as of now amount to approximately $313,000 (over and above the management fees it received during fiscal year 1980 of $322,000 and was continuing to receive during fiscal 1981); and

(vi) J. Harlan Stamper's law firm would have been deprived of the opportunity to collect legal fees in connection with the liquidation of the assets of the Trust, which it received in connection with the sale of the four Denver properties.
Bolton II Complaint at ¶ 15.

5. The Plaintiffs provide the following information about the value of the properties involved (in thousands):

| | Selling Price | Fair Market Value | Terrydale Equity at Selling Price | Terrydale Equity at Fair Market Value |
|---|---|---|---|---|
| Lincoln Tower (and Note) | $14,134 | $26,720 | $8,138 | $20,720 |
| Petroleum Building | 6,713 | 13,350 | 4,354 | 10,990 |
| Century Plaza Bank | 7,605 | * | 2,186 | ** |
| Travelers Building | 2,845 | 4,860 | 2,420 | 4,435 |
| Totals | $31,297 | $52,535 | $17,098 | $38,331 |

\* in excess of $7,605.
\*\* in excess of $2,186.

Bolton II Complaint at ¶ 17. The transfer of the Lincoln Tower Building included the transfer of a $3,000,000 note.

The plaintiffs contend that the subsequent sale of the same equity interest in the Lincoln

The real estate transactions described above require some elaboration to explain the roles of San Francisco Real Estate Investors ("SFREI"), Lincoln Tower Building Corporation ("Lincoln"), and Subdale Corporation ("Subdale") in Bolton II. SFREI purchased all four buildings at the February 6 closing. The plaintiffs allege that an SFREI director stated that SFREI viewed the transaction as "an opportunity that was made in heaven" given the circumstances that SFREI was "sitting with $32 million in cash" and that the trustees wanted to divest the Trust of its assets in the face of the takeover bid. Bolton II Complaint at ¶ 18.

A right of first refusal to purchase the Lincoln Tower Building initially blocked this transaction. Lincoln, a New York partnership, owned the land the building was situated upon and, under the terms of the ground lease, had sixty days to determine whether it would purchase the building at the same price and under the same terms as SFREI. To preserve this right and still close the sale on February 6, SFREI and the Trust agreed to extend the right of first refusal beyond the time of the actual transfer to SFREI. Allegedly, Lincoln accepted this modification of its right and the trustees agreed to indemnify Lincoln against any damages or legal fees arising from these transactions. On March 9, 1981, after Lincoln had refused to waive its right, the plaintiffs informed Lincoln by letter of the impending litigation challenging the validity of the trustees' actions. Thereafter, Lincoln formed Subdale, a New York corporation, for the purpose of exercising the right of first refusal, which it did on April 22, 1981.

Bolton II comprises a series of federal securities law claims and a series of state law claims.

First, the plaintiffs cite numerous sections of the 1934 Act allegedly violated by the defendants' actions surrounding the sale.[6] In this regard, they note that the defendants' proxy statement preceding the annual meeting and the defendants' annual report espoused an investment policy of long-term investment, reinvestment, and equity build-up, and explicitly renounced short-term profit-taking and liquidation. Bolton II Complaint at ¶ 20. For example, the 1980 Annual Report praised the Trust's acquisition of the Century Bank Building, one of the four buildings sold on February 6, as an "*excellent* long term hedge against inflation," boasting of upcoming lease renewals and of the 9½% mortgage it had assumed. *Id.* The plaintiffs contend that the trustees concealed certain details of the lease agreements [7] that would have brought the inequities of the February 6 sale to light. The absence of these details allegedly prevented the plaintiffs from seeking to enjoin the sale at the time.[8] Further, they assert that the failure of the proxy statements to disclose the defendants' intent to terminate the Trust in the event that the shareholders did not accept the anti-takeover amendments was materially misleading because it caused the plaintiffs to go ahead with their tender offer. They allege that the Schedule 14D–9 statement filed by the defendants failed to disclose the conflict of interest of the trustees John J. Gramlich, J. Russell Gramlich, and J. Harlan Stamper. Bolton II Complaint at ¶ 20.

They also allege that the January 21, 1981 letter of the trustees which recommended that the shareholders reject the

---

Tower Building for $12,500,000, 50% more than the Trust received less than one month earlier, illustrates the sacrifice the Trust accepted.

6. The sections cited in Claim I of the Bolton II Complaint are: § 10(b), 15 U.S.C. § 78j(b), § 13(e), 15 U.S.C. § 78m(e) § 14(a), 15 U.S.C. § 78n(a), § 14(d)(4), 15 U.S.C. § 78n(d)(4) and § 14(e), 15 U.S.C. § 78n(e). The plaintiffs' memorandum of law only offers legal theories supporting derivative causes of action under

§ 14(e) and § 10(b). The Court therefore deals with the other sections very briefly.

7. These details include: rent roll, lease expirations, rental per square foot, revenues, operating expenses, and the annual rate of rental increase in the Denver area.

8. This contention is crucial to the showing of causation which the plaintiffs must make in stating a cause of action under § 10(b).

plaintiffs' tender offer contained materially false or misleading statements. Bolton II Complaint at ¶ 31.[9]

The plaintiffs round out their series of federal claims with a theory that would bring the defendants within the range of the § 16(b) proscriptions. Section 16(b) of the 1934 Act, 15 U.S.C. § 78p(b), provides that an issuer's insiders must return to the issuer any profits gained whenever any purchase and sale of the issuer's stock occur within a single six month period. This theory holds that a sale occurred either when the partial liquidating distribution was made on February 23, 1981 or when the trustees voted to terminate the Trust on February 6, 1981.[10] Less than six months before the first liquidating distribution, several of the defendants purchased a total of 37,737 shares in the Trust.[11] Since these defendants were insiders or were members of a family [12] owning more than 10% of the Trust's stock, the plaintiffs contend the provisions of § 16(b) require them to disgorge

their profits to the Trust. Bolton II Complaint at ¶ 39–40.

The remainder of the Bolton II claims arise under state law. First, the plaintiffs contend that the sale was ultra vires because the Declaration of Trust required a unanimous vote and three of the trustees were personally interested and therefore disqualified. Bolton II Complaint ¶ 21–22. Second, they contend that in selling the properties for an inadequate price the trustees, aided and abetted by SFREI, breached their fiduciary duty to the shareholders. Bolton II Complaint at ¶ 23–24. Third, the plaintiffs charge the defendants with gross negligence. Bolton II Complaint at ¶ 27–29. And finally, the plaintiffs allege that the trustees, aided and abetted by SFREI, tortiously interfered with the plaintiffs' business opportunities in thwarting their acquisition of control of the Trust.

In Bolton II, the plaintiffs seek the restoration of the status quo ante, an accounting for the Trust's losses, damages (including punitive damages), and a disgorging of the

**9.** The specific allegations are as follows: (1) the trustees possessed no bona fide belief in their recommendation; (2) the statement that a successful offer would destroy the Trust's tax-exempt REIT status was false or misleading in light of the fact that deductible expenses incurred by the Trust (in proposing the antitakeover amendments and in defending Bolton I and II) would mitigate the impact of taxes in 1981 and the fact that the trustees intended to terminate the Trust; (3) that the trustees advised the shareholders of a shareholder suit which sought to enjoin the tender offer when the trustees in fact had no bona fide belief that that lawsuit would delay or prevent the offer; (4) that the trustees referred without basis to the possibility of far better options; (5) that the trustees incorrectly referred to a conflict between the Trust and the plaintiffs over the control of the Trust; (6) that the statement said that the Gramlich family had decided not to tender any of its shares without disclosing their personal interest in their decision; (7) that the statement purported not to include the recommendations of J. Russell and John J. Gramlich when in fact the other trustees knew the Gramlichs opposed the tender offer; (8) that the trustees' threat that they would refuse to transfer tendered shares to BCG in order to protect the Trust's tax exempt status misleadingly failed to disclose that BCG could still acquire the shareholders' proxies and thereby vote to remove the trustees, obtain control, and revoke the instructions; (9) that the trustees warned

that tenderers might be subject to a pro rata take up when in fact the Gramlichs' decision not to tender decreased the probability that a very large percentage of the shares could be refused (plaintiffs admit that if all the shares other than those owed by the Gramlichs were tendered, they would purchase only 50% of those shares); and (10) the trustees informed the shareholders that tendered shares would be "out of your possession and control (barring a competing tender or exchange offer) from February 10, 1981 until March 6, 1981" without specifically stating that if there were a competing tender offer, the shareholders would have ten business days in which to rescind their tender.

**10.** The termination entailed the redemption within one year of all the shares. A final liquidating dividend of $9.50 per share was declared on December 30, 1981.

**11.** The individual purchases were as follows: John J. and Michael Gramlich, 29,390 shares; James A. Kostoryz, 7,347 shares; Terrydale Management Corp. ("TMC"), 1,000 shares.

**12.** John J. Gramlich is a trustee. Michael Gramlich, his brother, joined him in this purchase of stock. James A. Kostoryz is John J. Gramlich's brother-in-law, as he was at the time of the purchase.

§ 16(b) profits. In addition, they seek to bar the defendants from sharing in any recovery in this action which might otherwise accrue to them by virtue of their stock ownership. Bolton II Complaint at ¶ A–F. The plaintiffs argued before the Court on October 5, 1981 that restoration of the status quo ante would not require the return of the $24.00 per share distributed to the shareholders. They state that available refinancing of the buildings, taking into account their true market value, would cover the refund of the purchase price to SFREI and Subdale, rendering joinder of the shareholders unnecessary.

The defendants again base their attack on the pleadings on the inappropriateness of this forum. They argue that the federal claims all fail either for want of standing or for failure to state a claim and that once the federal claims are removed from the case, the state claims must fail for want of subject matter jurisdiction. The plaintiffs and defendants disagree as to whether there is complete diversity in Bolton II, the controversy centering on the presence of two New York defendants, Lincoln and Subdale.[13]

Finally, in both Bolton I and Bolton II, many of the defendants, including the Trust, which is a nominal defendant, make motions to transfer these actions to the Western District of Missouri.

## II

## DISCUSSION

### A. *Bolton I*

1. *The Sufficiency of the Federal Claim*

■ The survival of the federal securities law claim based on § 14(a) of the 1934 Act and Rule 14a–9 in Bolton I depends on finding that the plaintiffs are among the class of persons for whose *"especial* benefit the statute was enacted," and that the rem-

edy sought is "consistent with the underlying purpose of the legislation." *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). The Supreme Court has identified two other factors in its analysis of whether a statute implies a private cause of action: whether the legislature has indicated its intent to create a private cause of action and whether the matter has "traditionally [been] relegated to state law." *Id.* at 78, 95 S.Ct. at 2087. In *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), when faced with the question whether shareholders could maintain a direct action or a derivative action on behalf of a corporation, the Court analyzed the latter two factors with respect to § 14(a) and Rule 14a–9 and found both factors pointed to the existence of a private cause of action. The finding in *Borak* that shareholders could maintain these actions also dealt with the questions of the status of the plaintiffs and the effectiveness of the relief in serving the statutory purpose, but the facts of individual cases will necessarily affect the application of these two factors. In each case, the court must determine whether the plaintiffs are within the protected class and whether the requested relief will further the statute's purpose.

The parties to this action differ in their analysis of the plaintiffs' status.

The defendants would characterize the plaintiffs as disappointed tender offerors seeking reimbursement for expenses they now view as ill-spent. That is, even though the plaintiffs were able to boost their ownership in the Trust to 37.98%, the value of control has faded in the aftermath of the vote to terminate the Trust. Trustees' Memorandum at 15–18. They argue that the alleged omissions from their proxy statement were not material to the plaintiffs, Trustees' Reply at 8 (citing *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S.

---

**13.** The plaintiffs argue that the complaint explicitly excludes Lincoln and Subdale from the state law claims. The defendants counter that the complaint ends with a single prayer for relief which includes the recission of the sale of the property, a remedy which necessarily includes Lincoln and Subdale. Thus, they say, Lincoln and Subdale should be considered parties to the state law claims and those claims should fail for lack of subject matter jurisdiction.

438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)), noting that the plaintiffs' tender offer was designed to defeat the proposed amendments and that the amendments were in fact defeated. The defendants further argue that because § 14(e), 15 U.S.C. § 78n(e), is the section of the securities laws intended to regulate tender offers, it would be improper to permit tender offerors who could not find a remedy in § 14(e) to avail themselves of § 14(a). Trustees' Reply at 8–9.

The plaintiffs characterize themselves not as tender offerors but as proxy contestant shareholders, who opposed the defendants' amendments because they were misled by the defendants' failure to disclose that if the amendments failed they would terminate the Trust. Plaintiffs' Memorandum at 79–80. Since the relief they seek is reimbursement for their proxy fight expenses, however, they are forced to forgo the argument that they sue derivatively on behalf of the Trust, as they do in some of the Bolton II claims. *Id.* at 80; see *supra* at p. 828.

At the outset, it is important to recognize that the Supreme Court's conclusion in *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), that a disappointed tender offeror cannot sue under § 14(e) did not mean that any time a plaintiff has made a tender offer, it will be barred from suing under § 14(e). In *Chris-Craft,* the Supreme Court entertained the suggestion that the tender offeror might have been able to sue in its capacity as a Piper shareholder, *id.* at 35, 97 S.Ct. at 946, a view the dissenting opinion adopted, *id.* at 53–55, 97 S.Ct. at 955–956. But it rejected the suggestion because it found that Congress intended § 14(e) to protect a shareholder in deciding whether to tender stock and a tender offeror is not in the position of having to decide whether or not to tender. Thus, a tender offeror cannot be a member of the protected class, despite stock ownership. *Id.* at 35–37, 97 S.Ct. at 946–947.

It is therefore apparent that the Court should not dismiss the plaintiffs out of hand because they were tender offerors but must analyze their role in the proxy contest in relation to the purpose of § 14(a). The Supreme Court has stated that Congress intended § 14(a) to safeguard the corporate voting process. *J. I. Case & Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964). Free exercise of the corporate franchise requires disclosure of the " 'real nature of the questions' for which the proxy is sought." *Id.* (citing S.Rep.No. 792, 73d Cong., 2d Sess., 12).

In the instant case, the plaintiffs contend that the defendants failed to disclose that termination of the Trust would result from defeat of the amendments. Since they did not seek termination of the Trust, they would not have opposed had they known of this consequence. They necessarily base their argument on this chain of causation rather than on the effect of the nondisclosure on their votes, because of the damages they claim. It was, of course, the dissemination of their own proxy statement and not their vote that incurred the expense for which they now seek reimbursement.[14]

It is not clear that the legislative purpose does not extend to the eradication of rival proxy statements that the management's deceptive proxy statement may induce. The purpose of purifying the flow of information to the shareholder may indeed include information from parties who unwittingly release misleading information after they themselves are deceived.

But for these plaintiffs to state a cause of action they must be the parties for whose "*especial* benefit" Congress undertook to regulate proxy statements. It is here that plaintiffs' claim fails. To the extent that the plaintiffs' activities fall within the purpose of § 14(a), their role in the voting process is that of unwitting propounders of deceptive information. Thus, like the tender offerors in *Chris-Craft,* they are per-

---

14. The defendants argue that relief is precluded because the plaintiffs achieved their goal in defeating the amendments. This argument misses the point: the plaintiffs allege that they

formed their goal on the basis of the information available and that if the defendants had made the required disclosure, they would have acted differently.

sons Congress intended to regulate, not to protect. *See Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 37, 97 S.Ct. 926, 947, 51 L.Ed.2d 124 (1977).

Analysis of the second relevant *Cort v. Ash* factor demonstrates the necessity of this conclusion. The relief sought by the plaintiffs would simply not further the congressional purpose, even when that purpose is stated in broad terms of purifying the flow of information to voters. Reimbursement of proxy expenses incurred in reliance on management's deceptive statement would tend to encourage rival proxy solicitations, that is, to increase the flow of information to voters. This remedy might result in some useful information, but might equally well further cloud the issues. Insofar as it is only by alleging that their own statements were based on deception that proxy contestants could avail themselves of the remedy, only the cost of disseminating deceptive information would be reimbursed.

The Supreme Court in *Chris-Craft* found a monetary remedy to a defeated tender offeror not " 'consistent with the underlying legislative scheme,' " because it would not benefit the protected class of shareholders. *Id.* at 39, 97 S.Ct. at 948 (*citing Cort v. Ash*, 422 U.S. at 78, 95 S.Ct. at 2087). Likewise, in the instant case, reimbursing the plaintiffs could at best only indirectly benefit the protected class, by generally encouraging a flow of information. And, on the other hand, it could harm this class by compounding the deceptive information.

For these reasons, the Court dismisses the federal claim in Bolton I.

## 2. *The Sufficiency of the State Law Claims*

■ The defendants seek dismissal of the state law claim on the grounds of failure of personal jurisdiction[15] and failure to comply with Fed.R.Civ.P. 23.1.

The defendant trustees and nontrustees both argue at length in their reply memoranda, after cursorily raising the issue in their earlier memoranda (Trustees' Memorandum at 55, Nontrustees' Memorandum at 8), that there is no basis for personal jurisdiction in New York.

The plaintiffs have failed to note any actions of the defendants with regard to the derivative claims in Bolton I that fall within the New York long-arm statute, N.Y.Civ. Prac.Law § 302 (McKinney). The plaintiffs allege that a Missouri trust was tortiously injured by actions of Missouri residents in Missouri. Since there are apparently no facts that connect the derivative claim to New York, it is not surprising that the plaintiffs avoided this issue both in their memorandum and at oral argument.

Accordingly, the Court dismisses the derivative claims of Bolton I and does not reach the question of failure to comply with Rule 23.1.

## B. *Bolton II*

### 1. *Sufficiency of the Federal Claims*

#### a. *Derivative Claim under § 14(e)*

■ The plaintiffs center their argument in Bolton II on the theory of a derivative claim on behalf of the Trust arising out of § 14(e), the section of the 1934 Act that forbids "fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer." 15 U.S.C. 78n(e). The defendants argue that since tender offerors cannot maintain a private cause of action under § 14(e) because they are not among the class of persons Congress intended to protect, they cannot adequately represent

---

**15.** Previously, defendants attacked the Court's subject matter jurisdiction over these claims, arguing that there was no pendent jurisdiction both because the federal claim must fail and because it shared no "common nucleus of operative fact" with the federal claim, *see United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). This issue has dropped out of the case because the plaintiffs have conceded the lack of a "common nucleus," Plaintiffs' Memorandum at 81. The Court's dismissal of the federal claim, too, would preclude this issue. 383 U.S. at 726, 86 S.Ct. at 1139. The plaintiffs now base subject matter jurisdiction only on diversity. *See* Plaintiffs' Memorandum at 81; Bolton I Complaint at ¶ 1.

the shareholders as required by Fed.R. Civ.P. 23.1 in a derivative action. As discussed above, p. 833 *supra, in Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35–37, 97 S.Ct. 926, 946–947, 51 L.Ed.2d 124 (1964), the Supreme Court noted that although the tender offeror is a shareholder, it is not among the class protected by § 14(e) because it is not faced with the decision whether to tender. The defendants argue that to allow the plaintiffs to bring a derivative action would impermissibly circumvent *Chris-Craft.* They point out that the plaintiffs' failure to qualify as individual plaintiffs, and their resultant inadequacy to serve as named parties if this were a Rule 23 class action, necessarily renders them inadequate to sue on behalf of the Trust under Rule 23.1.

The defendants' analogy to class actions is untenable. The named plaintiffs in a Rule 23 class action must themselves have suffered the kind of injury common to the class. But the plaintiffs in a Rule 23.1 derivative action must simply be capable of presenting the issues fairly in court; how the events in question affected them personally never enters the picture. The Rule 23.1 derivative action is based on the right of the issuer, and hence, only the injury to the issuer is at issue. Shareholders qualify to bring suit on behalf of the issuer based on their stock ownership, through which they suffer an indirect injury.

Rule 23.1 refers to the plaintiffs' adequacy as litigators. Thus, the court should only find the plaintiffs inadequate if there is a conflict of interest that affects their ability to present the issues forcefully or if the plaintiffs and the other shareholders disagree as to the best means of vindicating the issuer's rights. *Sweet v. Bermingham*, 65 F.R.D. 551 (S.D.N.Y.1975). The question raised is whether those interests which set the plaintiffs apart from the other shareholders will tend to cause them to disregard their interests. *Davis v. Comed, Inc.*, 619 F.2d 588 (6th Cir. 1980); *Blum v. Morgan Guaranty Trust Co.*, 539 F.2d 1388 (5th Cir. 1976); *G. A. Enterprises, Inc., v. Leisure Living Communities, Inc.*, 517 F.2d 24 (1st Cir. 1975).

The defendants, rather than addressing themselves to the appropriate question, argue that permitting these plaintiffs to use a derivative action under § 14(e) permits defeated tender offerors to sidestep the limitations of *Chris-Craft.* This argument urges an unwarranted extension of *Chris-Craft.* In that case, the Supreme Court only refused to consider the plaintiffs' standing in terms of their position as shareholders because they were not shareholders faced with the decision whether to tender and they fell outside of the class of intended beneficiaries of § 14(e). *See* pp. 833–834, *supra.* The Court declines to infer from that discussion of individual standing that anyone who has made a tender offer will fail to adequately represent the interests of the issuer.

The problem of sidestepping *Chris-Craft* is, in fact, a false issue. In a derivative action, defeated tender offerors cannot seek reimbursement for their expenses, which was the relief sought in *Chris-Craft*, but only remedy for injury to the issuer.

The Court therefore finds that the defendants have failed to show disqualification under Rule 23.1.

▆▆▆ The Court must now address the question whether the Trust may maintain a private right of action under § 14(e). The dispositive issue here is causation, for unless the violation of § 14(e) caused the injury complained of, the action must fail. The plaintiffs seek compensation to the Trust for the harm incurred in the sale of the Denver buildings and the termination of the Trust. Their complaint alleges that the defendants violated § 14(e) through various misleading statements and omissions in their opposition to the tender offer. *See* p. 830, *supra.* But they never connect these violations to the injury in question: the sale of the property and termination of the Trust.

The plaintiffs' memorandum of law takes a different tack but also fails to show causation. There, the plaintiffs posit that the defendants breached their state law fiduciary duties in selling the buildings and ter-

minating the Trust and merely add that that breach occurred in connection with a tender offer. Plaintiffs' Memorandum at 33.

■ The allegations in Bolton II reveal no way to establish this causal link. The "sole purpose" of § 14(e) is to protect shareholders confronted with a tender offer. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). In enacting the provision, Congress intended to improve the flow of information to the shareholder faced with the decision whether to tender. *Id.* The allegations of false and misleading statements and omissions may suffice to state a violation of § 14(e),[16] but they do not show that these statements and omissions had any material effect in the harm to the Trust, the sale and termination. The sale and termination occurred before the defendants knew how many shares would be tendered. Thus, the failure of disclosure and its possible effect of reducing the number of shares tendered cannot be causally connected to the trustees' decision to liquidate the Trust.

Moreover, the Court cannot find evidence of legislative intent to create a private right of action for issuers harmed by breaches of fiduciary duty of the kind presented here. *See Touche Ross & Co. v. Redington*, 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). The legislative history, summarized in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), speaks in terms of providing truthful information to shareholders, not in terms of fending off actions that management might take to destroy the value of the takeover.[17]

Accordingly, the plaintiffs' § 14(e) claim is dismissed.

b. *Sufficiency of the Derivative Claim Under § 10(b) and Rule 10b–5*

In order to state a cause of action under § 10(b), U.S.C. § 78j(b), and Rule 10b–5, 17 CFR 240.10b–5, on behalf of the Trust the plaintiffs must establish that the defendants employed a deceptive practice[18] in connection with the purchase or sale of a security and that that practice caused harm to the Trust. *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 471–74, 97 S.Ct. 1292, 1299–1301, 51 L.Ed.2d 480 (1977). Since the legislative purpose of § 10(b) is to preserve the integrity of the securities markets, the fraudulent activities of the directors must amount to more than mere mismanagement: they must involve some manipulation or deception that affects these markets. *Id.*

The plaintiffs' theory of causation rests on the holding of *Goldberg v. Meridor*, 567 F.2d 209 (2d Cir. 1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978). The *Goldberg* court found causation for the purposes of § 10(b) and Rule 10b–5 despite the fact that shareholder approval was unnecessary and despite the fact that the directors, whose vote was sufficient to authorize the action in question, were fully apprised of the material facts. There are two stages in this causality analysis. First, the court determines whether it must attribute the knowledge of the directors to the issuer. To sustain the right of action at

---

**16.** The defendants argue that any violation of § 14(e) was cured by the subsequent disclosure of the facts of the sale of the buildings and the termination of the Trust. Such disclosure preceded the deadline for deciding whether to tender and whether to withdraw shares already tendered. This argument is inadequate for two reasons: (1) they do not show that the subsequent disclosure completely eradicated the misleading statement; and (2) they do not address all of the alleged misstatements, enumerated at p. iv fn. 9, *supra*.

**17.** Analysis of the *Cort v. Ash* factors reinforces this view. First, the shareholders, not the

issuer, are the special beneficiaries of § 14(e). *See Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975). Second, there is no evidence of legislative intent to create the kind of private right of action plaintiffs allege. *See id.* Third, the relief requested would not further the legislative purpose of disclosure. *See id.* And fourth, breaches of fiduciary duty are traditionally relegated to state law remedies. *See id.*

**18.** Section 10(b) also remedies manipulative practices, *Santa Fe Industries, Inc. v. Green*, 430 U.S. at 471–74, 97 S.Ct. at 1299–1301, but none are alleged in this case.

this stage, the court must find both that the issuer lacked knowledge and that the undisclosed information was material. Second, the court determines whether the shareholders, acting on behalf of the issuer, could have barred the directors' action by seeking an injunction. In brief, if the issuer was deceived and if the shareholders could have prevented the harm had the information been public, the court deems the deception to have caused the injury. *Id.*

■ The knowledge of the directors is attributed to the issuer if the votes of the disinterested directors taken alone suffice to authorize the action. *Maldonado v. Flynn,* 597 F.2d 789 (2d Cir. 1979). If, however, there are not enough disinterested directors voting in favor of the proposal to reach the required level, any information undisclosed to the shareholders must be considered undisclosed to the issuer. *Id.*[19]

■ In order for such nondisclosure to form the basis of a Rule 10b–5 derivative action, it must be a material nondisclosure. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 474 & n.14, 97 S.Ct. 1292, 1301 & n.14, 51 L.Ed.2d 480 (1977). The court determines whether the nondisclosure is material by assessing whether there is a " 'substantial likelihood' " that a reasonable, disinterested director (or in Bolton II, trustee) would have found the missing information of " 'actual significance' " in his deliberations or if he would have seen it as " 'significantly alter[ing] the "total mix" of information made available.' " *Goldberg v. Meridor,* 567 F.2d 209, 218–19 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978)(adapting the Rule 14a–9 materiality test of *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

Finally, the ability of shareholders to enjoin the proposed action supplies the causal link between material nondisclosure and injury to the issuer, for unless disclosure would have enabled the issuer to avoid the injury, nondisclosure cannot be considered the source of the harm. *Goldberg v. Meridor,* 567 F.2d 209 (2d Cir. 1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).[20]

■ The plaintiffs' allegations must therefore be analyzed in light of this theory of causation.

The plaintiffs' first allegation of deception is that the trustees failed to disclose the plan to liquidate the Trust. But a deception that preceded the vote authorizing that liquidation cannot have disabled the shareholders from seeking injunctive relief. The shareholders would not have sought to enjoin the actions until the vote was taken, and by that time, the information had become public. Thus, the plaintiffs' first allegation of deception fails as a matter of law.

The plaintiffs next allege that the trustees failed to disclose the personal interest of some of the trustees. This failure of disclosure persisted even after the vote and, therefore, the Court must consider whether that information was substantially likely to have assumed " 'actual significance' " in the deliberations of a reasonable, disinterested trustee or if it would have " 'significantly altered the "total mix" of information made available.' " *Id.* at 218–19. Knowledge that some of the trustees would personally gain from the transaction is, however, significantly likely to enter into the deliberations of a reasonable, disinterested trustee and to alter the total mix of information. Even though the disinterested trustee would decide how to vote based on the value of the transaction to the Trust, the

---

**19.** The votes of the interested directors count towards determining the number of directors voting and whether there is a quorum. *Id.*

**20.** If, on the other hand, state law barred injunctive relief on behalf of the issuer, the 10b–5 action fails for want of causality. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 474 & n.14, 97 S.Ct. 1292, 1301 & n.14, 51 L.Ed.2d 480 (1977) (accepting conclusion of lower courts that existence of shareholder appraisal right precluded injunction of proposed merger). In Bolton II, there is no arguably preclusive alternative remedy, and defendants do not argue that state law would have barred injunctive relief.

fact that those who supported the transaction stood to gain from it would affect how the trustee would view their support. In addition, he might consider that the appearance of impropriety would tend to attract litigation, which would have an adverse effect on the Trust.

The plaintiffs also allege that the defendants failed to disclose information about the value of the Denver buildings. The most recent available appraisals dated back to June 1, 1980. Moreover, the public was not informed about favorable details such as "rent roll, lease expirations, rent per sq. ft., revenues, operating expenses, alleged comparables, failure to weight low interest mortgages, 20% to 25% annual rate of increase in Denver values, etc." Bolton II Complaint ¶ 20(vii).[21] Although the shareholders knew the properties were extremely valuable, id. at ¶ 20(vi), specific details and up-to-date appraisals would be necessary to calculate whether the price offered for the property was appropriate. Certainly, then, these facts would have entered into the deliberations of a reasonable disinterested trustee.

Thus, the plaintiffs' second and third allegations of deception are not immaterial as a matter of law.

The defendants attempt to avoid a finding of deception by arguing that the vote of disinterested trustees was sufficient to attribute their knowledge to the Trust. See Maldonado v. Flynn, 597 F.2d 789, 795 (2d Cir. 1979). The crucial questions are how many votes were required to authorize the action in question and how many trustees were disinterested. In Maldonado, a majority of the directors present was needed. Id.[22] The court found no deception because of the five directors present, four who voted in favor of the proposal were disinterested and undeceived. Id. Thus, their

knowledge was attributed to the corporation and the corporation, like the directors, was deemed not deceived. Id.

The plaintiffs in Bolton II allege that three of the five trustees were interested because they had a "financial stake...in the transaction under consideration." See Maldonado v. Flynn, 597 F.2d 789 793 (2d Cir. 1979). The defendants appear to concede for the purposes of this motion that the two Gramlich trustees had a personal stake; however, they argue that the third allegedly interested trustee, J. Harlan Stamper, did not. Trustees' Memorandum at 44–45 & n.12. The plaintiffs allege that Stamper had a personal stake in the sale of the building because the law firm in which he was a partner stood to gain substantial legal fees that would be generated by the liquidation and sale. Bolton II Complaint ¶ 15. The defendants attempt to liken his interest to that of the defendant lawyer in Maldonado. Trustees Memorandum at 44–45, n.12. But in Maldonado, the plaintiffs had merely alleged that the defendant lawyer's position as the corporation's lawyer, may have "motivated him to curry favor" with the interested parties. 597 F.2d at 794. The lack of any specific benefit that would run to him if he voted in a particular way left him disinterested. Id. In Bolton II, the legal fees that would result from the sale and termination supply the specific interest that was lacking in Maldonado. See id. Thus, the allegations in the Bolton II complaint sufficiently establish that three directors were interested in the vote.

The Declaration of Trust required the vote of a majority of the trustees to authorize the cash sale of the buildings, Declaration of Trust, Art. III, § 14, therefore, unless three disinterested trustees voted for the sale, the Maldonado defense is unavailable.[23] In Bolton II, only two of the trustees

---

**21.** The defendants, who argue that there was no relevant nondisclosure, never refer to this section of the Complaint. See Trustees' Reply Memorandum at p. 16.

**22.** A quorum of half of the board was also required. These requirements were traced to Delaware state law, since neither the corporate

charter nor the bylaws provided different requirements. In Bolton II, the Declaration of Trust provides the voting requirements.

**23.** The defendants argue that a "majority of a quorum" and a majority of disinterested directors approved the sale, Trustees Memorandum at p. 44. In so arguing, they misconstrue

may be considered disinterested for the purpose of this motion, and, consequently, their knowledge cannot be attributed to the Trust.

The Declaration of Trust required a unanimous vote of the trustees to approve the termination. Declaration of Trust, Art. IV, § 1. Here, even one interested trustee would preclude the *Maldonado* defense.[24]

Bolton II differs from *Maldonado* in another respect. In Bolton II, the plaintiffs allege that the Gramlichs have dominated and controlled the Trust, Bolton II Complaint at ¶ 11, an allegation missing in *Maldonado*. Since "[d]omination or control of a corporation or of its board by those benefitting from the board's action may under some circumstances preclude its directors from being disinterested," *Maldonado v. Flynn*, 597 F.2d 789, 795 (2d Cir. 1979), this allegation raises a question of fact that precludes the granting of a motion to dismiss.

Having found the allegations of causality sufficient, the Court must now analyze whether the deception was "in connection with" the purchase or sale of a security. *See* § 10(b), 15 U.S.C. § 78j(b); *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–169, 30 L.Ed.2d 128 (1971).

■ The defendants argue that neither the vote to terminate the Trust nor the partial liquidating dividend is a purchase or sale and that even if it were, it was not in connection with the alleged deception. When it is unclear whether a securities transaction constitutes a sale by the shareholder, the determinative factor is whether "the nature of the seller's investment has been fundamentally changed from an inter-est in a going enterprise into a right solely to a payment in money for his shares." *Dudley v. Southeastern Factor and Finance Corp.*, 446 F.2d 303, 307 (5th Cir.) *cert. denied sub nom. McDaniel v. Dudley*, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); *see Vine v. Beneficial Finance Corp.*, 374 F.2d 627, 635 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). By this standard, a liquidation constitutes a sale. Moreover, the sale in substance occurs when the vote to liquidate takes place, because it is at that point that the nature of the investment changes into a mere right to receive money as between the parties to the sale, the Trust and the shareholder.

The fact that the completion of the exchange of cash for an investment interest may not occur for many months is irrelevant. The purchase or sale occurs when the commitment to the transaction is made. *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir. 1972). In Bolton II, this commitment occurred when the trustees voted to terminate the Trust. Although *Radiation Dynamics* involved a sale pursuant to a bilateral agreement and Bolton II involves a sale forced by unilateral action, the § 10(b) goal of promoting fairness in the marketplace dictates that the same standard apply. In a bilateral agreement to sell, that goal demands that neither party use undisclosed insider information when the agreement is made, since it is then that deception would occur. By the same token, material information should be disclosed in a forced sale at a time when the failure to disclose can cause harm. In this regard, it is important to remember the theory of causation upon which this deriva-

---

the *Maldonado* test. The Court cannot construct an imaginary vote of three directors, even if such a vote could meet the provisions of the Declaration. (The Declaration does not speak in terms of a quorum; it speaks in terms of all of the trustees.) Five trustees voted; a majority of five is three.

**24.** The question is not, as the defendants seem to think, *see* Trustees' Reply Memorandum at p. 15, whether the vote of disinterested trustees was enough to block the transaction. The question is whether the knowledge of the disinterested trustees is attributed to the Trust. The *Maldonado* standard is therefore higher than mere "veto power."

In addition, the defendants confuse the availability of the *Maldonado* defense with the question whether shareholder approval was required. In this derivative action under Rule 10b–5, we are concerned with whether the Trust was deceived, not with whether the actions were properly authorized by the vote.

tive action rests. Causation arises from the concurrence of material nondisclosure and the availability of injunctive relief. And it is at the point when the vote occurred that the shareholders could have sought the injunctive remedy if the disclosure failure had not disabled them. To find that a sale occurs only when the final distribution is made would permit the defendants to escape Rule 10b–5 liability simply by scheduling a later date for the distribution of the Trust's assets.

The defendants counter that even if the shareholders were sellers, the Trust was not a purchaser, and thus lacks standing in this derivative action. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 738, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975). They suggest, without citing authority, that the Trust receives nothing in exchange for its distribution and hence, purchases nothing. Trustees' Reply at p. 12. The Court rejects their suggestion: upon liquidation, the shareholder's interest is extinguished in exchange for cash. That the Trust does not receive the shares and retain them as treasury shares is not a meaningful distinction. Just as the shareholder functions as a seller when his investment changes from an interest in a going enterprise to a right solely to receive money, the issuer, insofar as it effectuates that change, functions in substance as a purchaser. The Court therefore finds that the necessary purchase or sale has occurred.

▇▇▇▇▇ The next question is whether the violation of Rule 10b–5 occurred "in connection with" that purchase or sale. In order to state a cause of action under the rule, the issuer must have "suffered an injury as a result of deceptive practices touching its [purchase or] sale of securi-ties." *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–169, 30 L.Ed.2d 128 (1971). The defendants would have the Court view the liquidating distribution as a separate transaction, unconnected to the sale of the buildings and the termination of the Trust which allegedly caused the harm. But the virtually simultaneous votes to sell the buildings, to terminate the Trust, and to begin to distribute the Trust's assets are more properly viewed as a series of interdependent transactions. All were motivated by the same desire to avoid the plaintiffs' takeover. Indeed, all three actions are aspects of liquidation. In deciding whether the harm to the Trust occurred in connection with the purchase or sale of securities, the Court declines to erect partitions around these closely connected transactions.[25]

The Court therefore finds that the plaintiffs have stated a derivative claim under § 10(b) and Rule 10b–5.

▇▇▇▇ Lastly, the defendants argue that Fed.R.Civ.P. 23.1 bars a derivative suit. This rule requires that a shareholder bringing such a suit

"allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for his failure to obtain the action or for not making the effort."

In Bolton II, the plaintiffs have alleged that they did not make this effort because the personal interest of the defendants and their participation in the wrongdoing complained of rendered any effort patently futile. Bolton II Complaint at ¶ 6(e).[26] The Court finds these allegations sufficient.[27]

---

25. The Court also rejects the contention that a liquidating issuer cannot be harmed because it merely distributes its assets and "expects to receive nothing in return." *See* Reply at p. 12. If, as plaintiffs allege, the defendants sold the property at a grossly unfair price, not only dashing justified hopes of future profits but also failing to procure even the fair present market value, their actions have clearly harmed the Trust. That the Trust expired as a result does not establish that the actions did no harm.

26. The Second Circuit Court of Appeals has explained the futility exception as follows:

"[W]here the directors and shareholders are antagonistic, adversely interested, or involved in the transaction attacked, a demand on them is presumptively futile and need not be made."

*Cathedral Estates, Inc. v. Taft Realty Corp.*, 228 F.2d 85, 88 (2d Cir. 1955).

27. The determination of whether the Rule 23.1 requirement of a demand may be excused lies

In light of the foregoing, the defendants' motions to dismiss the Rule 10b–5 claim are denied.

### c. Sufficiency of the § 16(b) Claim

Those defendants charged with running afoul of § 16(b), 15 U.S.C. § 78p(b),[28] seek to avoid the requirement that they disgorge their profits to the Trust by arguing, first, that the liquidating dividend did not constitute a sale for the purposes of § 16(b), and second, that they realized no profit from that dividend.[29]

Although the Court has already determined that the liquidating dividend was a sale by the shareholders for the purposes of § 10(b), the different purposes of § 16(b) require a second analysis. Section 16(b) expressly states its purpose: to prevent the unfair use of insider information in the purchase or sale of stock. 15 U.S.C. § 78p(b). The Supreme Court has noted that the specific harm addressed is the "exploitat[ion by insiders of] information not generally available to others to secure quick profits." *Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 591, 93 S.Ct. 1736, 1742, 36 L.Ed.2d 503 (1973). To this end, § 16(b) requires insiders to return to the issuer any profit made from any sale and purchase that occur within a single six month period. Even though this section imposes a form of strict liability, the ability of insiders to structure unorthodox transactions dictates that its applicability extend beyond "traditional cash-for-stock transactions." *Id.* at 593–95, 93 S.Ct. at 1744–1745. Section 16(b) therefore applies to unorthodox transactions when they provide insiders an opportunity for speculative abuse. *Id.* at 595, 93 S.Ct. at 1745. A

completely involuntary sale will not entail liability then because the seller has no way to use any information he may have. *Id.* at 600, 93 S.Ct. at 1747; *Foremost McKesson v. Provident Securities*, 423 U.S. 232, 245, 96 S.Ct. 508, 516, 46 L.Ed.2d 464 (1976) (imposition of § 16(b) liability without fault inconsistent with congressional purpose). In Bolton II, there was a forced sale, but each of the defendants either voted to force the sale or was closely related to someone who did. While it is true that the liquidating dividend was distributed evenly to all shareholders, the insiders did have the opportunity to exploit their inside knowledge when they purchased their stock. If the insiders knew of an impending cash distribution, they could abuse that knowledge by purchasing shares in the uninformed market. Given this potential for speculative abuse, the Court cannot state as a matter of law that the liquidating dividend was not a sale within the meaning of § 16(b).

The defendants next contend that they realized no profit from the sale because they paid $24.25 per share for their stock and received only $24.00 in the distribution. Trustees' Memorandum at p. 54. They admit that the market value of their shares immediately prior to the forced sale was approximately $33.00, but they insist that they realize no profit until they recoup the $24.25 paid. But plainly, the $24.00 represented a return of capital under the liquidation. Their profit then can be calculated by ascertaining the percentage of the market value per share represented by the $24.00 distribution, applying that percentage to the $24.25 purchase price, and subtracting the latter figure from $24.00.

---

within the discretion of the district court judge. *Elfenbein v. Gulf & Western Industries*, 454 F.Supp. 6 (S.D.N.Y.) aff'd, 590 F.2d 445 (2d Cir. 1978); *Brick v. Dominion Mortgage & Realty Trust*, 442 F.Supp. 283 (W.D.N.Y.1977).

The Court expresses no opinion regarding the plaintiffs' contention that the demand was made in substance. *See* Plaintiffs' Memorandum at p. 44.

**28.** For a list of the defendants involved in this claim and the amounts of stock purchased, *see* fn. 11 *supra*.

**29.** They do not deny that they purchased the shares as plaintiffs allege; nor do they deny their insider status and the consequent applicability of the section.

842

Having rejected both of the defendants' arguments, the Court finds that the plaintiffs have stated a claim under § 16(b).

#### d. Venue for the Federal Claims

■ The defendants contend that venue in the Southern District of New York is improper.[30] Section 27 of the 1934 Act, 15 U.S.C. § 78aa, permits venue in any district in which "any act or transaction constituting the violation" occurred. The act upon which venue is premised must have had "material importance" in the wrongful scheme. *Hilgeman v. National Insurance Co.*, 547 F.2d 298, 301 (5th Cir. 1977).

■ In Bolton II, the plaintiffs allege that the initial contact between John J. Gramlich and the SFREI representative that led to the sale of the buildings occurred when Gramlich was staying in a New York City hotel, that the trustees entered into an agreement with Lincoln which made the February 6 sale of the Lincoln Tower building possible, and that the liquidating distribution included New York forced sellers (*e.g.*, the plaintiffs in this action). The Court finds these acts materially important to the alleged scheme to violate § 10(b). Venue is therefore proper under § 27.

Although no acts relevant to the § 16(b) claim occurred in New York, the Court has discretion to retain jurisdiction over a second related federal issue when venue is proper in the first. 1 Moore's Federal Practice ¶ 0.140[5]. The Court finds that it should retain the § 16(b) claim for the same reasons of efficiency and fairness considered below in relation to the motions to transfer.

#### e. Miscellaneous Federal Claims

The Court must briefly consider several additional federal claims raised in the complaint.[31]

■ The plaintiffs allege that the defendants violated § 13(e), 15 U.S.C. § 78m(e), and Rule 13e–1, 17 C.F.R. § 240.-13e–1, when they announced the liquidation plan during the pendency of the tender offer. Rule 13e–1 requires an issuer purchasing its own shares to file certain information with the Securities Exchange Commission ("SEC") and to provide information to the shareholders. Even if the partial liquidating dividend or the vote to liquidate must be considered a purchase requiring compliance with Rule 13e–1, a question the Court need not decide, a private right of action in this case must fail. Since there is no connection between the harm for which remedy is sought and the evil which Congress intended to prevent,[32] the Court finds no evidence of congressional intent to provide a private cause of action in this instance. The disclosure of the liquidation plan before any arguable purchase took

---

30. Only the "nontrustee defendants," Michael J. Gramlich, James A. Kostoryz, and Terrydale Management Corporation, properly raise this issue as to the § 10(b) claim. The trustees, having failed to raise the issue in their original memorandum of law, have waived their objections to venue. *See* Fed.R.Civ.P. 12(h). Their reply memorandum would excuse this failure by noting that the complaint asserted an individual cause of action as well as a derivative one, and that the plaintiffs' abandonment of the individual claims in their memorandum raised the issue of venue for the first time. Trustees' Reply at p. 23. This excuse is untenable. The defendants were obligated to foresee the failure of the individual claims (indeed, they argued they should fail) and the consequential venue problem. Moreover, their objection was not dependent on the plaintiffs' abandonment of the individual claims: the Court might have dismissed those claims.

31. The Court rejects the defendants' suggestion that the plaintiffs' failure to discuss these claims in their Memorandum of Law constitutes withdrawal of the claims.

32. H.R.Rep.No.1711, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code Cong. & Ad.News 2811, 2814–2815, provides:

"Whatever the motive behind a repurchase program, if the repurchases are substantial they will have a significant impact on the market price of the security. The shareholders of a company and other persons interested in the market price of its stock should have full information regarding the company's activities and intentions in repurchasing its own stock."

place precluded the kind of evil Congress addressed in § 13(e). The § 13(e) claim is therefore dismissed.

The Bolton II Complaint at ¶ 20(viii) realleges the § 14(a), 15 U.S.C. § 78n(a), and Rule 14a–9, 17 C.F.R. § 240.14a–9, private cause of action stated in Bolton I and dismissed therein, *supra*, pp. 832–834. The plaintiffs again allege the failures of disclosure were material only insofar as they induced the plaintiffs to wage a proxy contest. Thus, for the same reasons stated in Bolton I, the § 14(a) claim is dismissed.

■■■ The Complaint at ¶ 20(ix) alleges that the trustees caused the Trust to file a materially false and misleading Schedule 14D–9 with the SEC. *See* 15 U.S.C. § 78n(d); 17 C.F.R. § 240.14d–9. The plaintiffs attack the assertion in the Schedule that "there is currently no . . . actual or potential conflict of interest between the person filing this statement (the Trust) or its affiliates and the executive officers, directors or affiliates of the subject company other than the information disclosed in the proxy statement attached hereto . . .". They allege that this statement was false and misleading because in fact the trustees planned to liquidate the Trust. Without reaching the questions of whether a private cause of action might arise under § 14(d), the Court merely notes the complete absence of any causal connection to the injury alleged in the Complaint, in light of the disclosures of February 6, 1981. The § 14(d) claim is therefore dismissed.

### 2. State Law Claims

■■■ The discussion of the federal law claims above has disposed of most of the defenses to the state law claims. The argument that the plaintiffs failed to comply with Fed.R.Civ.P. 23.1 was rejected *supra* p. 822. Arguments that the Court lacks diversity jurisdiction need not be considered now that the Court has sustained some of the federal claims. Since there is no doubt

that the state and federal claims share a common nucleus of operative fact, the Court will consider the state claims within its pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The only remaining state law issue is the motion to dismiss for failure to state a claim raised solely by Lincoln and Subdale. The Court deals with this motion below, following its consideration of these defendants' motion to dismiss for lack of subject matter jurisdiction.

### 3. Parties

The remaining issues, aside from the motions to transfer, address the question which parties are properly before the Court.[33]

The law firm Morris, Larson, King, Stamper and Bold, P.C., raises two defenses: lack of personal jurisdiction and failure to comply with the Rule 9(b) requirement that allegations of fraud be pleaded with particularity.

■■■ The law firm's defense to jurisdiction depends on whether it had sufficient contacts with New York to meet the due process fairness standard of the fifth amendment. Section 27, 15 U.S.C. § 78aa, provides the statutory basis for personal jurisdiction over the firm in all the surviving Bolton II counts. The provision for service of process "wherever the defendant may be found" in § 27 was intended to extend personal jurisdiction as far as due process allows. *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1339–40 (2d Cir. 1972). This jurisdiction extends to all claims arising from the same core of operative fact as the 1934 Act claims. *International Controls Corp. v. Vesco*, 593 F.2d 166, 175 n.5 (2d Cir.), *cert. denied*, 442 U.S. 941, 99 S.Ct. 2884, 61 L.Ed.2d 311 (1979). In Bolton II, no one disputes that the state claims arise out of the same core operative fact as the federal claims.

---

**33.** The Court has considered the substantive issues first because not all parties raised these procedural issues, making it inevitable that the substantive issues would be reached, and because first narrowing the case at hand to its properly stated claims would simplify the discussion of the procedural issues that touched upon some of the defendants.

■ The Court must therefore decide whether the assertion of jurisdiction over this defendant would comply with due process. Due process requires that a defendant have had enough contact with the forum state to make it fair to force it to defend itself there. *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292–97, 100 S.Ct. 559, 564–567, 62 L.Ed.2d 490 (1980). In Bolton II, the law firm has had no contact with New York. The trustee J. Harlan Stamper is also a member of the law firm, but there is no allegation that he or anyone else acted in New York on behalf of the firm.

Accordingly, the Court grants the law firm's motion to dismiss and does not reach the Rule 9(b) question.

■ SFREI moves to dismiss the complaint as against it on the ground of lack of personal jurisdiction.[34] It argues first, that it is not subject to the broad provisions of § 27 and second, that it does not come within any of the bases for personal jurisdiction in the New York long arm statute.

The Court agrees that § 27 cannot form the basis for the assertion of jurisdiction over SFREI. Since there is no allegation that SFREI itself violated the 1934 Act, the applicability of § 27 depends on whether the plaintiffs have sufficiently alleged that SFREI aided and abetted a 1934 Act violation. *See Keene Corp. v. Weber*, 394 F.Supp. 787, 790 (S.D.N.Y.1975). For SFREI to be considered an aider and abettor in the § 10(b) violation sustained above,[35] the plaintiffs must allege that SFREI knew or recklessly disregarded those violations and that it gave substantial assistance to them. *See IIT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 922–23 (2d Cir. 1980). The claim of violation of Rule 10b–5 sustained above consisted of the failure to disclose the personal interest of some of the trustees and certain details relating to the true value of the Denver buildings. The plaintiffs only allege that SFREI knew of the trustees' plan to dispose of the buildings for a grossly inadequate price in breach of their fiduciary duties and that it gave substantial assistance to that plan; they do not allege that SFREI knew of or aided the relevant failures of disclosure. *See Rolf v. Blyth, Eastman Dillon & Co. Inc.*, 570 F.2d 38, 44–48 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978). Therefore § 27 cannot serve as a basis for personal jurisdiction, as the complaint presently stands.

Absent jurisdiction under § 27, jurisdiction over SFREI depends on the availability of the New York long arm statute, N.Y. Civ.Prac.Law § 302(a)(1) (McKinney) (transaction of business).[36] The only alleged contact SFREI had with New York was a single telephone call from George Mann, a trustee of SFREI and resident of Toronto, Ontario, Canada. Mann, having heard of a possible investment opportunity in the Trust, first called the Trust's Kansas City office from his Toronto location to inquire about the opportunity. Affidavit of George Mann, ¶ 3. Informed that he could reach the trustees in New York, Mann made a single telephone call to New York and spoke with one of the trustees to arrange a meeting, which took place in Toronto.[37]

---

**34.** SFREI also moved that, in the event the Court found it subject to personal jurisdiction, it should dismiss the federal claims for the reasons stated in the trustees' motions and dismiss the state claims for the consequential failure of the subject matter jurisdiction. The Court has considered these issues above and need not discuss them again in this context.

**35.** There is no allegation that SFREI aided and abetted the § 16(b) violation.

**36.** The plaintiffs do not and cannot assert that SFREI "does business" in New York, within the meaning of N.Y.Civ.Prac.Law § 301. Other provisions of § 302 are likewise inapplicable.

**37.** Mann states that he called on behalf of Unicorp Financial Corporation, a Canadian corporation of which he is chief executive officer, and only subsequently referred the matter to SFREI. *Id.* The plaintiffs present the Court with deposition testimony of Mann in which Mann stated that he made the call "as George Mann," but knew that the opportunity presented was precisely the kind of opportunity that interested SFREI. Deposition of George Mann at p. 123. Since the Court finds there is no

The New York Court of Appeals held in *Presidential Realty Corp. v. Michael Square West, Ltd.*, 44 N.Y.2d 672, 376 N.E.2d 198, 405 N.Y.S.2d 37 (1978) that a single meeting in this state, which occurred in the course of negotiations for the sale of real estate, did not constitute the transaction of business under § 302(a)(1). In *Presidential Realty*, the single meeting resulted in certain modifications in the agreement between the parties, but the parties negotiated the material terms of the agreement and closed the sale elsewhere. The Court finds the telephone call in Bolton II to be of much less consequence than the meeting in *Presidential Realty*.[38]

Thus, as the complaint presently stands, there is no statutory basis for personal jurisdiction over SFREI, and the motion to dismiss is granted. The Court, however, grants the plaintiffs forty-five (45) days from the date of filing of this Opinion in which to amend their complaint to meet the aiding and abetting standard set forth in *Rolf* and to show that the assertion of jurisdiction over SFREI would meet the constitutional due process requirements.

■■■■ Lincoln and Subdale object both to subject matter jurisdiction and to the sufficiency of the claims against them. They note first that the plaintiffs do not assert a federal claim against them and that there is no diversity of citizenship between them and the plaintiffs. Subject matter jurisdiction must fail unless it properly rests on the theory of pendent party jurisdiction. Under this theory, once a federal court has jurisdiction over a federal claim to which state law claims may be appended, it may also assert jurisdiction over nondiverse parties against whom only the state claims are alleged. In *Aldinger v. Howard*, 427 U.S. 1, 15–19, 96 S.Ct. 2413,

2420–2422, 49 L.Ed.2d 276 (1976), the Supreme Court noted that pendent party jurisdiction may not offend Article III when the statutory grant of subject matter jurisdiction does not explicitly or implicitly negate the exercise of such jurisdiction. *Id.* at 18, 96 S.Ct. at 2422; *accord, Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 398, 98 S.Ct. 2396, 2416, 57 L.Ed.2d 274 (1978). Under this standard, if the statutory scheme in which the grant of jurisdiction appears excludes a particular party, the court may not exercise pendent party jurisdiction. *Aldinger v. Howard*, 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976) (municipal corporations seen as excluded from liability under 42 U.S.C. § 1983, therefore no pendent party jurisdiction under 28 U.S.C. § 1343)[39]; *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 98 S.Ct. 2396, 57 L.Ed.2d 274 (1978) (no pendent party jurisdiction under diversity grant, 28 U.S.C. § 1332(a)(1) for nondiverse parties); *In re New York City Municipal Securities Litigation*, 507 F.Supp. 169, 188 (S.D.N.Y.1980) (no pendent party jurisdiction over city under § 27 of the 1934 Act, 15 U.S.C. § 78aa, because cities excluded from substantive provisions of 1934 Act); *Depaja Enterprises, Ltd. v. American Bank & Trust Co.*, 454 F.Supp. 413, 416–17 (S.D.N.Y.1978) (no pendent party jurisdiction over bank under § 27 of the 1934 Act, 15 U.S.C. § 78aa, because banks excluded from substantive provisions of 1934 Act). When Congress has not expressly or implicitly negated the exercise of jurisdiction, however, courts have been willing to exercise pendent party jurisdiction, particularly when jurisdiction over the federal claim is exclusive. *See, e.g., North Dakota v. Merchants Nat'l Bank & Trust Co.*, 634 F.2d 368, 374 (8th Cir. 1980) (pendent party jurisdiction permissible in case reviewing federal ad-

jurisdiction even if Mann acted on behalf of SFREI, it need not resolve this factual question.

**38.** The Court also rejects the attempt by plaintiffs to bolster their allegations with the speculation that SFREI must have had some involvement in the Lincoln-Terrydale modification of the right of first refusal. *See Presidential Realty Corp. v. Michael Square West*, 44 N.Y.2d 672, 376 N.E.2d 198, 405 N.Y.S.2d 37 (1978)

(Court refused to consider mere speculation that other contacts occurred).

**39.** *Aldinger* preceded *Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which held that municipal corporations in fact are subject to § 1983 liability.

ministrative action brought under § 1331(a) ((federal question jurisdiction)), where availability of state court jurisdiction over main claim uncertain); *Ortiz v. United States,* 595 F.2d 65, 72 (1st Cir. 1979) (Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80, does not explicitly or implicitly exclude private hospitals as parties, therefore federal court exercising jurisdiction over main action pursuant to 28 U.S.C. § 1345 ((United States as plaintiff)) could assert pendent party jurisdiction); *Transok Pipeline Co. v. Darks,* 565 F.2d 1150, 1155 (10th Cir. 1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978) (pendent party jurisdiction permissible where jurisdiction in main action pursuant to 25 U.S.C. § 357 ((condemnation of Indian lands)), which grants exclusive federal jurisdiction and does not implicitly negate exercise of jurisdiction over the other parties named).

 In light of the interest in adjudicating related claims in a single forum, the grant of exclusive jurisdiction tends to show that Congress did not intend to negate the exercise of jurisdiction over pendent parties. *Aldinger v. Howard,* 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976). Thus, when jurisdiction over the federal claim is exclusive, the court should look for some evidence that Congress intended to force plaintiffs to bifurcate litigation arising out of a single core of operative fact before it finds implicit negation of pendent party jurisdiction.

"Section 27, 15 U.S.C. § 78aa grants exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."

Moreover, broad venue and service of process provisions of § 27 evince an intent to gather complex securities litigation in a single forum. No provisions of the 1934 Act explicitly or implicitly negate pendent party jurisdiction. Since neither Lincoln nor Subdale can claim to be the kind of parties who would be excluded from the coverage of the 1934 Act if they had committed a securities law violation,[40] the Court finds the exercise of pendent party jurisdiction over Lincoln and Subdale permissible.[41]

The Court need not exercise this power unless it finds that the assertion of pendent party jurisdiction in this case would be a sound exercise of discretion. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726–29, 86 S.Ct. 1130, 1139–1140, 16 L.Ed.2d 218 (1966). The Court must consider whether pendent party jurisdiction would serve the interests of judicial economy and convenience and fairness to the litigants. *Id.* Lincoln and Subdale's roles provide an important link in the transactions that form the basis of this litigation. In addition, the plaintiffs' request for a rescission remedy may depend on their inclusion in this case. It is clear that the consolidation of the claims relating to these parties[42] in this lawsuit would serve the interests of judicial economy and convenience. The question of fairness to the defendants thus becomes

**40.** Their status contrasts to that of municipal corporations and banks, which are specifically excluded from the Act's coverage and hence, not subject to pendent party jurisdiction under § 27. *See In re New York City Municipal Securities Litigation,* 507 F.Supp. 169, 188 (S.D.N.Y.1980); *Depaja Enterprises Ltd. v. American Bank & Trust Co.,* 454 F.Supp. 413, 416–17 (S.D.N.Y.1978).

**41.** In *In re Investors Funding Corp. Securities Litigation,* 1980 Fed.Sec.L.Rep. (CCH) ¶ 97, 717 (S.D.N.Y.1980), Judge Conner found that the limitation of § 10(b), under which the federal claim against other parties was stated, to claims of fraud in connection with the purchase or sale of a security, did constitute the kind of

implied negation of pendent party jurisdiction referred to in *Aldinger.* However, as noted above, this Court is of the view that "implied negation" is more than the present unavailability of a cause of action under the federal statute. If such a cause of action existed, there would be federal jurisdiction without the use of the pendent party jurisdiction device: pendent party jurisdiction would be a mere redundancy.

**42.** Those claims are the ones that charge the trustees with gross negligence and acting ultra vires. They are excluded from the claims of tortious interference with business opportunity and breach of fiduciary duty.

crucial. The defendants argue that because of their tangential role it would be unfair to embroil them in this complex securities case. The Court notes, however, that the Trust, in procuring Lincoln's consent to the modification of Lincoln's right of first refusal, agreed to

"hold [Lincoln] harmless against all costs [Lincoln] may incur as a result of defending litigation brought against [Lincoln] by or on behalf of Terrydale shareholders or Terrydale and against any damages [Lincoln] may suffer, whether through litigation or otherwise, by agreeing to convert its right of first refusal on the Lincoln Tower property into an option to repurchase said property from SFREI."

Affidavit of Sidney Bender, dated Jan. 13, 1982, citing the Trust's Jan. 8, 1982 Proxy Statement at p. 9. Further, the defendant trustees J. Russell and John J. Gramlich "have personally guaranteed performance" of this agreement. *Id.* In light of this indemnity agreement, the interests of judicial economy and convenience significantly outweigh the concern for fairness to Lincoln and Subdale.

The Court therefore denies the motion to dismiss for lack of subject matter jurisdiction.

Lincoln and Subdale go on to challenge the sufficiency of the state law claims. The complaint expressly excludes Lincoln and Subdale from all of the state claims except those charging the trustees with acting ultra vires and with gross negligence in the breach of their fiduciary duties. The sufficiency of these claims as against Lincoln and Subdale depends in part on the extent and time of Lincoln's knowledge of the alleged wrongdoing—a matter which is not clearly apparent on the face of the complaint and as to which information regarding the indemnity agreement set forth in the Jan. 8, 1982 Affidavit, may be relevant. The Court will therefore refrain from determining whether the allegation contained

in the present complaint that Lincoln received notice from the plaintiffs on March 9, which was after the modification of the right of first refusal, is sufficient. Bolton II Complaint at ¶ 8. The Court grants the plaintiffs forty-five (45) days from the date of the filing of this Opinion in which to amend their claims against Lincoln and Subdale to clarify those claims if they wish to do so. If plaintiffs do not wish to avail themselves of the opportunity to replead, the Court should be promptly notified and we will proceed to determine the sufficiency of the existing allegations.

### 4. *Motions to Transfer*

All of the remaining defendants, the trustees, the "nontrustees," and the Trust, move to transfer this case to the Western District of Missouri, pursuant to 28 U.S.C. § 1404(a).

■ The defendants must show that the interests of convenience and justice weigh strongly in their favor before the Court will disturb the plaintiffs' choice of forum. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947).[43]

■ The defendants have not made the necessary showing in this case. Some of their justifications for transfer are no longer relevant: the theory that the Western District of Missouri is the only forum where all of the plaintiffs' claims may be heard together disappears in light of this Court's dismissal of the defendants' motions to dismiss for improper venue; concern for the convenience of SFREI and the Morris, Larson law firm has no force now that they are dismissed as parties; the argument that the Trust's records are too massive to transport to New York and that important witnesses reside in Missouri must be discounted because the plaintiffs have consented to

---

**43.** *Gilbert* interpreted the common law doctrine of forum non conveniens. The same standard of weighing the interests of convenience and justice applies to § 1404, but the trial judge may exercise greater discretion. *See Piper Aircraft Co. v. Reyno,* —— U.S. ——, ——, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981).

conduct discovery in Missouri[44]; the contention that the Trust's shareholders must be added as parties fails in light of the plaintiffs' theory that it only seeks rescission made possible by the refinancing of the buildings and not by the return of the liquidating dividend, *see* Plaintiffs' Memorandum at 87–88. In addition, the Court finds merit to the plaintiffs' argument that insofar as much of the factual content of this case relates to the value of buildings located in Denver, the Kansas City forum is also inconvenient.

It is true, of course, that many, perhaps most, of the events that led to this litigation took place in Missouri. There are, however, sufficient ties to New York to provide venue under § 27, 15 U.S.C. § 78aa.

Finally, the necessity of applying Missouri law adds little to the defendants' argument. *See Manu Int'l, S.A. v. Avon Products, Inc.*, 641 F.2d 62, 67–68 (2d Cir. 1981).

The defendants having failed to make the showing necessary to overcome the plaintiffs' choice of forum, the Court denies the motions to transfer.

### CONCLUSION

In summary, the Court dismisses Bolton I in its entirety. In Bolton II, the Court dismisses the claims under § 14(e), 15 U.S.C. § 78n(e), § 13(e), 15 U.S.C. § 78m(e), § 14(a), 15 U.S.C. § 78n(a), and § 14(d), 15 U.S.C. § 78n(d). The Court sustains the plaintiffs' §§ 10(b) and 16(b) claims and their state law claims in Bolton II. The Court grants the motions to dismiss for lack of personal jurisdiction of the Morris, Larson law firm and SFREI, granting leave to file an amended complaint against SFREI. The Court denies the motion to dismiss for lack of subject matter jurisdiction of Lincoln and Subdale, and grants the plaintiffs forty-five (45) days from the date of the filing of this Opinion to amend its complaint against these defendants with respect to state law claims.

---

44. *See* Plaintiffs' Memorandum at p. 86; Transcript of Oral Argument at p. 72. In addition, this circuit has recently noted that present day ease of communication and travel seriously

Finally, the Court denies the defendants' motions to transfer pursuant to 28 U.S.C. § 1404(a).

SO ORDERED.

erodes arguments that witnesses reside at an inconvenient distance from this forum. *Manu Int'l, S.A. v. Avon Products Inc.*, 641 F.2d 62, 65 (2d Cir. 1981).